Judith B. Jennison, Bar No. 165929
JJennison@perkinscoie.com

Joseph P. Cutler, WSBA No. 37234
*(pro hac vice to follow)*
JCutler@perkinscoie.com

PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000
Facsimile: 206.359.9000

Attorneys for Plaintiff
Facebook, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

FACEBOOK, INC., a Delaware corporation;

Plaintiff,

v.

MARTIN GRUNIN, an individual;

Defendant.

Case No.

**COMPLAINT FOR:**

**1) BREACH OF CONTRACT**

**2) VIOLATION OF 18 U.S.C. § 1030**

**3) VIOLATION OF CALIFORNIA PENAL CODE § 502(c); and**

**4) FRAUD**

**DEMAND FOR JURY TRIAL**

## I. INTRODUCTION

1. Defendant Martin Grunin is a serial offender who has repeatedly violated Facebook's terms and applicable law. His unlawful activities include defrauding Facebook, accessing Facebook without authorization, selling access to Facebook advertising accounts without authorization, and tricking Facebook users into visiting commercial websites so that he could earn referral fees.

2. Facebook brings this action to stop Grunin's abuse of Facebook and to recover damages, Grunin's unlawful profits, costs and attorneys' fees, and other available relief.

## II. PARTIES

3. Plaintiff Facebook, Inc. ("Facebook") is a Delaware corporation with its principal place of business in Menlo Park, California.

4. Defendant Martin Grunin is a resident of New York.

## III. JURISDICTION AND VENUE

5. This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 because Facebook alleges that Grunin violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030. This Court has supplemental jurisdiction over Facebook's state law claims under 28 U.S.C. § 1367.

6. In addition or alternatively, this Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

7. This Court has personal jurisdiction over Grunin because he has consented to jurisdiction here. Facebook's Statement of Rights and Responsibilities ("SRR")—to which Grunin agreed when he joined Facebook, accessed Facebook's websites and services, and advertised on Facebook—provides that claims between the parties shall be resolved exclusively in this District.

8. In addition or alternatively, this Court has personal jurisdiction over Grunin because his unlawful activities are targeted at Facebook, which is headquartered in California;

because Grunin has conducted and still conducts substantial, continuous, and systematic business within this district; because Grunin engaged in acts outside of this district that he knew would cause injury within this district; and because the claims alleged in this Complaint arise out of or are related to Grunin's forum-related activities.

9. Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because Grunin agreed to comply with Facebook's SRR, which provides that claims shall be resolved exclusively in this District.

## IV. INTRADISTRICT ASSIGNMENT

10. Assignment to this Court's San Francisco Division is appropriate under Civil L.R. 3-2 because Facebook's principal place of business is in San Mateo County.

## V. FACTS

### A. Facebook's Social Network

11. Facebook offers an online service that enables people to connect and share. The company's service facilitates the sharing of information through the social graph—a digital mapping of people's real-world social connections. As of the filing of this Complaint, more than one billion people use Facebook each month.

12. To use Facebook, a person must sign up, provide his or her name, provide a valid email address or a verified mobile telephone number, and agree to the terms of use in Facebook's SRR.

### B. Advertising on Facebook

13. Facebook generates a portion of its revenue by selling ads that it displays to users when they use Facebook's websites or mobile applications.

14. Facebook sells ad space to individuals and organizations. Advertisers design their ads, select a destination page (where users are directed after clicking the ad), select from various targeting options (e.g., location, age, interests, education), and then complete their ad campaigns by specifying a budget, bid type (e.g., cost per click or cost per impression), and bid amount. Advertisers typically purchase ads directly through Facebook's online tool, and they may also interact with Facebook sales representatives from time to time for assistance with their accounts.

15. To standardize and protect the Facebook experience for users, all ads must comply with Facebook's Advertising Guidelines, which impose limits on format and content. For example, the Advertising Guidelines prohibit false, misleading, fraudulent, or deceptive claims or content. The Advertising Guidelines specify (among other things) that ads for adult friend finders or dating sites with a sexual emphasis are not permitted; that ads may not facilitate or promote illegal activity; and that ads may not contain adult content or activities that are overly suggestive or sexually provocative. The Advertising Guidelines also state that products and services promoted in the ad copy must be clearly represented on the destination page and that the destination site may not offer or link to any prohibited product or service.

16. Facebook's SRR incorporates by reference Facebook's Advertising Guidelines. Advertisers also agree to the Advertising Guidelines when they create Facebook ads.

17. To place ads on Facebook, advertisers must open an advertising account. Advertisers use advertising accounts to manage their campaigns and budgets and to track their campaigns' performance. Facebook permits advertisers to create multiple advertising accounts.

18. Advertising accounts typically have a spend limit (similar to a monthly limit for credit cards), which is the maximum amount Facebook allows an advertiser to spend on ads over a certain time period. If the advertiser makes payments on time, Facebook may incrementally increase the spend limit. The spend limit can also be increased with Facebook's approval. Facebook bills certain types of advertisers once per day. Facebook settles other accounts by invoicing the advertiser on a monthly or periodic basis.

**C. Grunin's Unlawful Activities**

19. Grunin agreed to Facebook's SRR when he created a Facebook account or accessed Facebook's websites and services. A true and correct copy of Facebook's current SRR and historical versions of the SRR are incorporated here by reference and attached as **Exhibit A**. The SRR contains provisions applicable to advertisers and also incorporates Facebook's Advertising Guidelines.

20. At all times relevant to this Complaint, Grunin was a registered Facebook user and bound by Facebook's SRR and Advertising Guidelines.

21. Beginning in early 2011, Grunin placed ads or caused ads to be placed on Facebook that contained sexually provocative content. These ads purported to offer casual dating services and included a picture of a woman with a sexually explicit and profane caption, in violation of Facebook's Advertising Guidelines.

22. Upon information and belief, when users clicked on the ads they were redirected to third-party websites that paid Grunin—either directly or as an "affiliate" of a marketing company—for referring people to the websites.

23. Facebook took technical measures to block Grunin's access, including disabling Grunin's personal account and advertising accounts on or about February 22, 2011, for violating Facebook's SRR and Advertising Guidelines (collectively, "Terms").

24. Grunin then circumvented Facebook's technical measures, created or obtained new accounts and resumed placing Facebook ads in violation of Facebook's SRR, which at all relevant times prohibited creating additional accounts if Facebook had disabled the user's account.

**D. Facebook Sends Grunin a Cease-and-Desist Letter**

25. On or about March 9, 2011, Facebook sent Grunin a cease-and-desist letter demanding that he and anyone working with him immediately stop accessing Facebook. Facebook also notified Grunin that his authorization to access Facebook had been revoked and that any further access to, or activity on, Facebook's websites or use of Facebook's services would be without authorization.

26. On March 11, 2011, Grunin confirmed receipt of the demand and responded with two words: "I comply." Grunin did not comply but continued to create personal and advertising accounts in violation of Facebook's Terms.

**E. Grunin Obtains and Traffics Facebook Advertising Accounts**

27. In addition to using Facebook to run noncompliant and deceptive ads, starting as early as February 2012, Grunin began using unauthorized means to obtain and sell access to Facebook advertising accounts that were unaffiliated with him and that had large spend limits. At all relevant times, Facebook's Terms forbade users from transferring either personal or

advertising accounts to third parties and from creating a new account if the user's prior account had been disabled.

28. On information and belief, under the username mGrunin, Grunin used affiliate-marketing forums to find buyers for Facebook advertising accounts for which he procured access through unauthorized means. For example, one post by mGrunin on such a forum stated the following:

> **Title: Selling a $30,000 Daily Limit Facebook Account**
> **Date:** 2/29/12 4:03 PM
> **Post:** The account is 1 year old. Has been actively promoted on for a year. Comes with a 2k Animal Charity Fan Page. Never received a warning email for this account. Payment will be either by Escrow or Direct Wire Transfer. I will keep the offer for this account open for a week and sell it to the best offer. The minimum offer I'll accept for it is $30,000. Reason for Selling: I have half a dozen high limit FB accounts that are sufficient enough for my FB campaigns. I've also been allocating my budget from FB to other mediums, so I'll be letting go off (sic) several accounts. During this account's life, I was throwing my cleaner/smaller campaigns on it.

29. Grunin updated his buyers on his inventory, posting both when he had accounts for sale and when those accounts had been sold:

> **Title: mGrunin's Facebook Accounts For Sale (Part II)**
> **Date:** 10/5/12 2:04 PM
> **Post:** Once again I should have a steady supply of Facebook Advertisement accounts. Below are the accounts I currently have available. If you need a limit above $10,000, let me know and I will have one created and sold to you for face value. Here is what I have: (2) $5,000 Daily Limit Account: $7,000/account (2) $10,000 Daily Limit Accounts: $12,500/account. None of the accounts I sell are linked to each other. None of these accounts were generated from an agency account or the agency account method. None of these account have a rep assigned to them to look them over. All of these accounts are fresh with no warnings. All of these accounts are US with Eastern Time Zone.
>
> **Title: mGrunin's Facebook Accounts For Sale (Part II)**
> **Date:** 10/10/12 8:49 PM
> **Post:** We have sold all accounts. Please PM me if you need a custom order placed.

30. Upon information and belief, Grunin sold access to Facebook advertising accounts—which he obtained through fraudulent and other unlawful means—to individuals who could not otherwise obtain a Facebook advertising account because they had been previously banned by Facebook, did not have adequate credit, or did not intend to pay Facebook for the ads.

### F. Grunin Impersonates Legitimate Companies to Obtain Advertising Access

31. On or about November 8, 2012, an individual using the alias "Kayla Stewart" began contacting members of Facebook's sales team, posing as an employee of legitimate

companies looking to advertise.

32. "Kayla Stewart" claimed to work for a company called Marketing Drive that owned an advertising company called Thinkmodo. Marketing Drive and Thinkmodo are real entities, but Facebook's subsequent investigation revealed that "Stewart" did not work for either.

33. "Stewart" asked Facebook to create new advertising accounts for Thinkmodo with high spend limits and to apply Marketing Drive's credit line to the Thinkmodo campaigns. Grunin's scheme was to fraudulently procure advertising accounts that would allow him (or his customers) to charge ads run from the fraudulently created "Thinkmodo" accounts to the legitimate Marketing Drive account. Because Marketing Drive was billed monthly, Grunin was able to run a large number of ads without paying for them before Marketing Drive or Facebook discovered the fraud.

34. "Stewart" used the fake domain <thinksmodo.com> instead of the real domain <thinkmodo.com> to email Facebook in an effort to conceal the scheme and trick Facebook into believing that the emails were from the actual Thinkmodo entity owned by Marketing Drive.

35. Eventually, in the course of reviewing the Thinkmodo accounts, Facebook asked "Stewart" to present information to verify that she represented Thinkmodo. "Stewart" was unable to do so.

36. Upon information and belief, Grunin sent the emails that were purportedly from "Kayla Stewart."

37. However, by the time Facebook discovered the fraud, Grunin had used the "Thinkmodo" accounts to run approximately $40,000 worth of deceptive ads, including misleading ads that appeared to be endorsed by celebrities Jennifer Lopez and Dr. Oz.

38. Facebook has not been paid for the ads it served for the unauthorized "Thinkmodo" accounts.

39. On or about February 21, 2013, an individual using the alias "Colan Neilson" contacted a Facebook sales representative by email and claimed that "Neilson's" employer, Imprezzio Marketing, was expanding into the Canadian market and needed ten new advertising accounts and a line of credit.

40. Upon information and belief, Grunin sent the email that was purportedly from "Colan Neilson."

41. On or about March 7, 2013, Facebook began receiving emails from "Felix Ward," the purported President of Imprezzio Marketing. Facebook's sales representative requested that "Ward" have one of his U.S. colleagues contact Facebook.

42. Upon information and belief, Grunin sent the emails that were purportedly from "Felix Ward."

43. Soon thereafter, the same Facebook representative received an email purportedly originating from "Joy Hawkins," the Search Engine Optimization Director of Imprezzio Marketing, using a joy@imprezziomarketing.com email address. The email stated: "Felix requested that I send this email to you. He will contact you in the next 15 minutes."

44. Upon information and belief, the real Joy Hawkins did not send this email to Facebook. Instead, Grunin either hijacked Hawkins's email account to send the email or "spoofed" the "from" line of his email to make it appear that it was from Hawkins.

45. When Facebook requested supporting documentation to establish the credit, Grunin sent falsified bank statements that purported to show Imprezzio Marketing's finances.

46. Relying on "Ward's" and "Neilson's" representations, the email from "Joy Hawkins," and the bank statements, Facebook provided accounts and a credit line billed to Imprezzio Marketing. Grunin then used the account to run at least $300,000 worth of ads that violated Facebook's Terms.

47. When Facebook contacted Imprezzio Marketing about the ads and charges, Imprezzio Marketing's representatives denied that the new accounts belonged to them and stated that no one named "Felix Ward" worked at Imprezzio Marketing and that the bank statements were falsified.

48. To date, Facebook has not been paid for the ads it served for the unauthorized "Imprezzio Marketing" accounts.

**G. Facebook Sends Grunin a Second Cease-and-Desist Letter**

49. On or about April 26, 2013, Facebook sent Grunin a cease-and-desist letter reiterating its demands that he cease his activities.

50. On or about April 29, 2013, Facebook hand delivered a copy of the letter to Grunin's father, Gennady Grunin, with whom Grunin is believed to reside.

51. On or about that same day, Facebook took additional technical measures to block Grunin's access to Facebook by disabling Grunin's known personal and advertising accounts.

52. Despite multiple attempts to contact him, Grunin has not responded to Facebook.

**H. Harm to Facebook**

53. Facebook has not been paid for at least $340,000 worth of ads purchased by or for Grunin on accounts unlawfully created or acquired by Grunin.

54. Grunin's unlawful marketing activity has tainted the Facebook experience for Facebook users and advertisers.

55. As a direct and proximate cause of Grunin's deceptive advertising and fraudulent advertising accounts, Facebook has suffered and continues to suffer harm to its reputation and goodwill.

56. Facebook has incurred damages attributable to the effort and resources used to identify, investigate, and remove Grunin's accounts and deceptive ads and attempt to stop Grunin's injurious activities. Each time Facebook implemented technical measures to disable one of his accounts, Grunin would, in an effort to avoid detection and circumvent Facebook's technical measures, adjust his behavior before creating, obtaining, or using new accounts and resuming his placement of noncompliant Facebook ads. Since 2011, Facebook has disabled at least 70 accounts linked to Grunin—many of which were registered using false information or false pretenses—for violations of Facebook's Terms.

57. Grunin has been unjustly enriched by his activities at the expense of Facebook.

## VI. CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### BREACH OF CONTRACT

58. Facebook realleges and incorporates by reference, as if fully set forth herein, the allegations in the foregoing paragraphs.

59. Access to and use of Facebook's websites and services is governed by and subject to Facebook's Terms.

60. Grunin accepted and agreed to Facebook's Terms, which were binding on him at all times relevant to this Complaint.

61. Facebook has performed all conditions, covenants, and promises required of it in accordance with Facebook's Terms.

62. Grunin, through his actions described above, knowingly, willfully, repeatedly, and systematically breached and likely continues to breach Facebook's Terms.

63. Grunin breached Facebook's Terms by, among other things, running deceptive ads, transferring accounts without Facebook's permission, providing false information to Facebook, continuing to access Facebook after revocation, and failing to pay for advertisements.

64. Grunin's breaches directly and proximately caused and continue to cause irreparable and incalculable harm and injury to Facebook.

### SECOND CAUSE OF ACTION
### COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030

65. Facebook realleges and incorporates by reference, as if fully set forth herein, the allegations in the foregoing paragraphs.

66. Facebook's computers are protected computers under 18 U.S.C. § 1030(e)(2) because they are used in and affect interstate and foreign commerce and communication.

67. Grunin accessed Facebook's protected computers without authorization and thereby obtained information from Facebook's protected computers in violation of 18 U.S.C. § 1030(a)(2). After Facebook expressly revoked Grunin's permission to access Facebook's protected computers, and disabled his Facebook accounts, Grunin created and transferred multiple new Facebook and advertising accounts and continued to run deceptive ads on Facebook.

68. Grunin knowingly, and with intent to defraud, accessed Facebook without authorization and, by means of such conduct, furthered his intended fraud in violation of 18 U.S.C. § 1030(a)(4) by impersonating agents of legitimate companies to obtain credit to run deceptive ads. Through his unauthorized access, Grunin obtained things of value, including credit and, on information and belief, payment for referral traffic and other advertising accounts.

69. Grunin caused irreparable and incalculable harm and injuries to Facebook and, unless enjoined, his conduct will cause further irreparable and incalculable injury for which Facebook has no adequate remedy at law.

70. Facebook has been damaged in excess of $5,000 during a one-year period by Grunin's unauthorized access, access in excess of authorization, and abuse of its protected computers.

**THIRD CAUSE OF ACTION**
**CALIFORNIA COMPUTER DATA ACCESS AND FRAUD ACT**
**CAL. PEN. CODE § 502(c)**

71. Facebook realleges and incorporates by reference, as if fully set forth herein, the allegations in the foregoing paragraphs.

72. Facebook maintains proprietary computers, computer networks, and computer systems.

73. After Facebook revoked his permission to access Facebook and took technical measures to block his access, Grunin knowingly and without permission circumvented those technical measures and accessed Facebook's proprietary computers, computer systems, or computer networks by, for example, creating new Facebook accounts, obtaining advertising accounts under false pretenses, and continuing to run deceptive ads on Facebook.

74. Grunin knowingly and without permission used Facebook's proprietary computers, computer systems, or computer networks to devise and execute a scheme to defraud and deceive by impersonating agents of legitimate companies to obtain credit to run deceptive ads.

75. Grunin's actions have directly, proximately, and irreparably harmed Facebook by, among things, causing Facebook to place ads without payment and requiring Facebook to expend

resources to investigate Grunin's access and abuse of Facebook and to prevent such access or abuse from recurring. The extent and amount of injury and damage will be proven at trial.

76. Grunin caused irreparable and incalculable harm and injuries to Facebook and, unless enjoined, his conduct will cause further irreparable and incalculable injury for which Facebook has no adequate remedy at law.

**FOURTH CAUSE OF ACTION**
**FRAUD**

77. Facebook realleges and incorporates by reference, as if fully set forth herein, the allegations in the foregoing paragraphs.

78. Grunin obtained access to Facebook advertising accounts using false information with the intent to use the accounts to place noncompliant ads on Facebook and not pay Facebook for ads placed through those accounts.

79. Grunin also obtained access to Facebook advertising accounts using false information with the intent to sell the accounts to other persons who would use the accounts to place noncompliant ads on Facebook and not pay Facebook for ads placed through those accounts.

80. On at least two separate occasions, Grunin contacted Facebook posing as the agent of legitimate advertising entities in order to create advertising accounts that would be billed to the legitimate advertising entities. In furtherance of his fraud, Grunin provided false information, including financial documentation that Grunin knew was false.

81. Grunin made these representations to Facebook with the intent to defraud and induce Facebook to provide him with advertising credit so that he could place deceptive ads that he would not have to pay for or so that he could sell access to the accounts to others who would also run noncompliant ads and not pay Facebook.

82. Acting in justifiable reliance upon Grunin's misrepresentations, Facebook provided him with advertising accounts and credit.

83. As a result of Facebook's reliance upon Grunin's intentionally false and deceptive conduct, Facebook provided more than $340,000 worth of advertising for which it has not been

paid. Facebook has also incurred significant economic damages attributable to the effort and resources used to identify Grunin's fraud, his multiple unauthorized accounts, and his deceptive ads. Grunin's intentionally false and deceptive conduct has tainted the Facebook experience for Facebook users, and Facebook has suffered and continues to suffer harm to its reputation and goodwill due to Grunin's actions.

84. Grunin caused irreparable and incalculable harm and injuries to Facebook and, unless enjoined, his conduct will cause further irreparable and incalculable injury for which Facebook has no adequate remedy at law.

## VII. PRAYER FOR RELIEF

**WHEREFORE**, Facebook asks for the following relief:

A. For a permanent injunction restraining Grunin, his agents, employees, and any person acting on behalf of or in concert with Grunin:

1. from accessing or using, or engaging third parties to access or use, Facebook's websites, services, platforms, and computer systems;
2. from engaging in any activity that violates Facebook's Terms; and
3. from engaging in any unlawful, misleading, or malicious activities directed at or relating to Facebook's websites, services, platforms, or computer systems.

B. An order requiring Grunin to account for and disgorge all profits derived by Grunin and his agents, employees, or persons acting on his behalf or in concert with him from his unfair and unlawful conduct, as permitted by law.

C. An order requiring Grunin to account for and to pay Facebook the value of any and all unpaid Facebook advertising charges that are attributable to Grunin's unfair and unlawful activities.

D. An award to Facebook of damages as permitted by law, including but not limited to compensatory, restitution, statutory, aggravated, and punitive damages, and in such amounts to be proven at trial.

E. For pre- and post-judgment interest as allowed by law.

F. For attorneys' fees and costs to the extent allowed by law.

G. For such other relief as this Court may deem just and proper.

DATED: May 20, 2014

**PERKINS COIE LLP**

By: s/Judith B. Jennison

Judith B. Jennison, Bar No. 165929
JJennison@perkinscoie.com

Attorneys for Plaintiff
Facebook, Inc.

## VIII.   JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Facebook demands a trial by jury as to all issues so triable in this action.


DATED: May 20, 2014                                **PERKINS COIE LLP**


By: s/Judith B. Jennison

Judith B. Jennison, Bar No. 165929
JJennison@perkinscoie.com

Attorneys for Plaintiff
Facebook, Inc.


LEGAL29196681.24